IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HAZEL MARY LOU LESTER,            )
                                   )
            Plaintiff,             )
                                   )
    v.                             )    1:21CV24
                                   )
KILOLO KIJAKAZI,                   )
Acting Commissioner of Social Security,[1] )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Hazel Mary Lou Lester ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on April 17, 2019. (Tr. at 16.)[2] Her application was denied initially (Tr. at 86-113, 142-50) and upon reconsideration (Tr. at 114-39, 151-60). Thereafter, Plaintiff requested an administrative hearing de novo before an

---

[1] Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #10].

Administrative Law Judge ("ALJ"). (Tr. at 161-75.) On August 24, 2020, Plaintiff, along with her attorney, attended the subsequent telephone hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 16.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 26), and, on November 18, 2020, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 5-10).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

2

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her application date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 18.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative joint disease of left shoulder; diverticulitis/irritable bowel syndrome; depression; anxiety; degenerative disc disease of the cervical spine; obesity and back arthralgia[.]

(Tr. at 18.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 18-20.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform medium work with further, non-exertional limitations:

> Specifically, [Plaintiff] is limited to frequent climbing of ramps and stairs, kneeling, crawling, crouching, stooping, and balancing; occasional climbing of ropes, ladders, and scaffolds; simple, routine, repetitive tasks that can be performed up to two hours at a time (learned by demonstration in 30 days or less); no contact with the public; occasional contact with co-workers and supervisors; routine changes; occasional use of foot pedals; frequent handling and fingering; frequent reaching overhead; no driving an automobile for

5

Case 1:21-cv-00024-CCE-JEP   Document 17   Filed 08/22/22   Page 5 of 14

> completion of job tasks; ready access to restroom during lunch and breaks; and able to use restroom for once an hour for five minutes.

(Tr. at 20-21.) Based on this determination, the ALJ found at step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 24-25.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 25-26.)

Plaintiff now argues that the ALJ failed to properly explain the basis for her RFC assessment. Specifically, Plaintiff contends that the ALJ failed to "offer any discussion or explanation connecting the evidence or record to her RFC conclusions regarding [Plaintiff's] diverticulitis and IBS." (Pl.'s Br. [Doc. #13] at 7.)

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. SSR 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work. Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (4th Cir. June 16, 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate

and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio, 780 F.3d at 636 (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Id. at 637.

In the present case, Plaintiff contends that the ALJ's conclusion that "episodes of fecal incontinence and diarrhea would be properly accounted for by a restriction to 'ready access to [a] restroom during lunch and breaks' and the ability to 'use [the] restroom for once an hour for five minutes' . . . is not supported by the evidence of record which reflects that [Plaintiff] might require more frequent or longer access to a restroom as needed; further, [Plaintiff] contends that the evidence supports a conclusion that [her] episodes of fecal incontinence and/or diarrhea are unpredictable and do not occur on a schedule." (Pl.'s Br. at 7-8.)

7

At her hearing, Plaintiff testified that she began having gastrointestinal issues before July 2016, and that she takes a fiber supplement and Miralax to try to address those issues. (Tr. at 60-61.) She also testified to stomach pain that is helped by taking Dicyclomine. (Tr. at 60.) When asked how often she had diarrhea, Plaintiff responded, "It really depends, but it could be three times a week. It could be multiple times. But at least three days a week I normally have it." (Tr. at 60.) When asked the same question regarding her stomach pain, Plaintiff answered:

> I'm going to say two, three, maybe four times a week I have it. And when I have it, it's just like an all-day kind of thing. It doesn't let up until afternoons. And that's after I've went. I mean—it's nothing for me to go six times. It's nothing for me to go 20 times in a day. And none . . . of the doctors have been able to . . . tell me why. . . . It just comes on[, and] [t]here's nothing that helps that . . . [u]ntil the episode's over.

(Tr. at 61-62.) The following exchange then took place between Plaintiff and her attorney:

> Q Ms. Lester, when you're having the bouts of diarrhea, can you perform your typical activities of daily living?
>
> A No sir. I mean, I have got to have on—I do have Depends. In case I need them, because I never know. And I try to stay pretty close to one of the bathrooms that's in my house. At that time.
>
> Q And these is reference in your treatment notes about some incontinence issues.
>
> A Yes, sir. Because sometimes I don't know that that has happened.
>
> Q How long have you been dealing with the incontinence issues:
>
> A Over a year. . . . Pretty much since I had my gall bladder. Right before I had my gall bladder taken out.
>
> Q When you do go out, do you have to strategically plan where the bathrooms are?
>
> A Yes, sir. I know where all the bathrooms are.

8

Case 1:21-cv-00024-CCE-JEP   Document 17   Filed 08/22/22   Page 8 of 14

> Q Does that limit you going out in public?
>
> A Yes, sir.
>
> Q And there's also a reference in your treatment notes that because of those issues and needing to know where a bathroom is, that you just don't like to go places.
>
> A I don't. I don't. . . . I'm just not comfortable. Because I never, you know, know.

(Tr. at 68-69.)

Later in the hearing, the ALJ questioned the vocational expert regarding the jobs subsequently relied upon at step five of the sequential analysis. In particular, the ALJ asked whether all the jobs identified by the expert had "ready access to a restroom during breaks and lunch hour or lunch period," to which the expert responded, "Yes. All." (Tr. at 80.) The ALJ then asked,

> Q [I]f the person needed to—let's say three days a week, would need to use the restroom more than that? Let's say, once an hour for five minutes they would need a restroom break. Would that be tolerated?
>
> A Yes, your honor. That is within the 10 percent off task. Employers do understand. And one can take up to 10 percent to be able to use a restroom, take a quick water or snack break throughout the day. Not all at once your honor.
>
> Q Okay. So, more than 10 percent. You're saying if the person took 10 minutes an hour, then that would be work preclusive.
>
> A Yes, it would interfere with one's production.
>
> Q And what about missing work? If the person missed two days a month, would that also preclude work?
>
> A Yes.

(Tr. at 81.) In line with this testimony, the ALJ included restrictions allowing restroom breaks of five minutes per hour in Plaintiff's RFC, plus restroom visits undertaken at lunch or during other scheduled breaks. (Tr. at 21.)

Plaintiff now challenges the ALJ's conclusion, questioning what, if any, evidence supports a finding that bathroom breaks of 5 minutes per hour would accommodate Plaintiff's gastrointestinal symptoms. However, a review of the ALJ's decision and the record as a whole demonstrates that the ALJ gave Plaintiff the benefit of the doubt by including the limitation in question. In particular, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms," including her gastrointestinal symptoms, "not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 21.) In support of this assertion, ALJ noted that

> [Plaintiff] initially stopped working to provide care for her mother. . . . She later reported diarrhea to her physicians, with left lower quadrant pain. In 2019, she reported constipation for 3-4 days and she would take miraLAX [sic], then having 8-9 bowel movements the following day. Testing was normal with left sided diverticulitis (Exhibit 9F).[5] It was noted she did not have evidence of acute diverticulitis on examination and a colonoscopy did not reveal evidence of m[a]croscopic disease such as colitis or Crohn's disease.[6] CT scan of the abdomen and pelvis was normal.

---

[5] The ALJ's reference to diverticulitis in this sentence, rather than diverticulosis, appears to be a scrivener's error. The exhibit referenced by the ALJ, Exhibit 9, reflects that Plaintiff previously experienced "an episode of uncomplicated diverticulitis in 2014," that she returned to the provider in April 2019 with symptoms consistent with diverticulitis, but that testing showed evidence of left-sided diverticulosis, a condition in which pouches or pockets form in the lining of the digestive tract, rather than diverticulitis, a more serious and symptomatic condition in which these pockets become infected. (See Tr. at 610, 611, 613, 555, 558, 565-66, 577.) Moreover, the following sentence, noting no evidence of acute diverticulitis upon exam, would make little sense otherwise. Such a reading is also consistent with prior accounts in the administrative decision, in which the ALJ noted that "[a] CT of [Plaintiff's] abdomen revealed multiple scattered colonic diverticulosis. (Exhibit 5F). In May 2019, the records revealed positive bowel sounds and [Plaintiff] was assessed with mild systematic disease with no functional limitations. (Exhibit 7F)." (Tr. at 22, 565-66, 577.)

[6] Elsewhere the ALJ similarly notes that "[t]here was no evidence of acute diverticulitis on examination and a colonoscopy did not reveal evidence of macroscopic disease." (Tr. at 22).

(Tr. at 23.) In addition, the ALJ further related that, by February 2020, less than a year after Plaintiff's application date, Plaintiff "denied gastrointestinal symptoms including diarrhea, constipation, or overt bleeding" (Tr. at 22 (citing Tr. at 714)), and her treatment was related to abdominal wall pain rather than diarrhea or incontinence (Tr. at 720, 732, 747). Plaintiff received only conservative treatment for her diarrhea (Tr. at 24), specifically a fiber supplement (Tr. at 61, 613, 632), and was given medication and then an injection for the abdominal pain, (Tr. at 732). Treatment records from May of 2020 further reflect that "after receiving intra-abdominal wall injections, she no longer has left lower quadrant abdominal pain which had plagued her for several years." (Tr. at 743, 23.) An abdominal CT in June 2020 noted only "very mild sigmoid diverticulosis" (Tr. at 791), and at an appointment in July 2020, Plaintiff denied abdominal pain or diarrhea (Tr. at 798).[7] Thus, the ALJ considered and relied on the medical evidence, including Plaintiff's reports to her providers, her conservative treatment, and the relatively normal and unremarkable test results, in evaluating Plaintiff's symptoms. None of this evidence supports limitations greater than those included in the RFC. In addition, the only medical opinion evidence of record, provided by the State agency medical consultants, concluded that Plaintiff could perform medium work with no restrictions relating to her diarrhea or incontinence. (Tr. at 96-97, 134-35.) However, based on the evidence received at the hearing level and crediting Plaintiff's testimony to the maximum extent

---

[7] In her most recent treatment notes, submitted to the Appeals Council, Plaintiff specifically "denie[d] fecal or urinary incontinence" to multiple providers, but reported "diarrhea daily" which she treated with fiber. (Tr. at 31, 34.)These records reflect that Plaintiff presented with complaints of back pain, and the records do not reflect any additional diagnosis or treatment related to her diarrhea.

supported by the record, the ALJ concluded that Plaintiff required additional limitations, including those relating to bathroom access. (Tr. at 24.)

Moreover, as the ALJ correctly notes, the fact that Plaintiff stopped working to care for her mother, rather than as a result of her impairments, undermines her contention that these gastrointestinal impairments require greater limitations or entirely preclude her from performing basic work activities. Plaintiff's contention is further eroded by testimony and medical evidence noting that her gastrointestinal impairments and symptoms significantly predated both the date she stopped working and her alleged onset date. As set out above, Plaintiff testified that she began experiencing gastrointestinal problems around July 2016. (Tr. at 60.) Additional treatment notes document that her impairments began even earlier, including an episode of diverticulitis in 2014. (See Tr. at 610.) Despite these difficulties, Plaintiff remained able to run a restaurant until 2017, when she began working less in order to care for her mother. (Tr. at 53-55.) Plaintiff testified that she stopped work entirely in March 2017 to care for her mother (Tr. at 52), but did not file her application for SSI until April 17, 2019 (Tr. at 16).[8]

The Court further notes that, even assuming Plaintiff's gastrointestinal issues worsened as of April 2019, Plaintiff fails to demonstrate that these impairments required greater restrictions than those included in the RFC assessment. Plaintiff, in turn, argues that "[t]here

---

[8] The ALJ also noted that Plaintiff's treatment records reflected a report of fecal incontinence in July 2019 while "at work." (Tr. at 22.) The treatment record from July 17, 2019 reflects that Plaintiff "[h]ad fecal incontinence last week . . . this happened at work." (Tr. at 601.) Thus, Plaintiff was apparently still reporting to her doctors that she was at work in July 2019. That treatment record also reflects that Plaintiff told her doctor in July 2019 that she was "[p]lanning on taking a vacation for 2 weeks to see her sister to 'get away,'" (Tr. at 601), and agency records reflect that Plaintiff reported that she would be out of town from July 29 through August 12, 2019 (Tr. at 106).

12

is no evidence clarifying how long [Plaintiff's] individual diarrhea episodes last or how long it may take her to change a soiled [D]epends (and/or clothes when necessary) following an episode of fecal incontinence." (Pl.'s Br. at 10.) However, in making this argument, Plaintiff fails to appreciate that it is her burden, rather than the ALJ's, to prove the extent of her limitations. Here, Plaintiff simply offered no evidence, in the form of testimony or otherwise, regarding the length of individual episodes of diarrhea or incontinence. She testified to wearing Depends on occasion but made no mention of limitations related to them. (Tr. at 68.) Thus, Plaintiff has presented no evidence to support limitations beyond those included by the ALJ.

Even more importantly for purposes of this Court's review, there is substantial evidence in the record to support the ALJ's interpretation and conclusion. The ALJ acknowledged, consistent with Plaintiff's reports to her providers, that Plaintiff may experience diarrhea 3-4 days per week with 8-9 episodes per day. (Tr. at 23, 555, 610.) Notably, Plaintiff's statements to her treating providers reflected that when Plaintiff experienced diarrhea, it was "eight low volume bowel movements a day" (Tr. at 22, 555), or "8-9 bowel movements" the day after she took MiraLAX to treat constipation (Tr. at 23, 610). The ALJ specifically cited and discussed these treatment records, and then included limitations in the RFC that would reasonably account for those limitations including "ready access to restroom during lunch and breaks" and the ability "to use restroom . . . once an hour for five minutes" in the course of an eight-hour workday. (Tr. at 21, 24.) Moreover, as set out above, the vocational expert in this case explained that the ability to use the restroom during the workday is generally flexible. Specifically, the expert testified that, although a restriction to

13

using the restroom once an hour for five minutes may be included in the RFC assessment, workers "can take up to 10 percent [of their work time] to be able to use a restroom [or] take a quick water or snack break throughout the day," so long as the time is not taken all at once. (Tr. at 81.) In light of this explanation, along with the evidence as a whole, Plaintiff's argument that she "might require more frequent or longer access to a restroom as needed" (Pl.'s Br. at 7) fails to render the ALJ's RFC finding unsupported by substantial evidence.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #12] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #15] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 22nd day of August, 2022.

/s/ Joi Elizabeth Peake
United States Magistrate Judge